FILED
ENDORSED
07 OCT -9 AM 10: 09
LEGAL PROCESS #9

Darrin W. Mercier, Esq., SBN 166125
Thomas J. Linville, Esq., SBN 221434
Law Office Of Darrin W. Mercier
409 West Center Street
Yreka, California 96097
(530) 842-2054 Telephone
(530) 842-9340 Facsimile

Matthew R. Eason, Esq., SBN 166125
EASON & TAMBORNINI
1819 K. St, Suite 200
Sacramento, California 95814
(916) 438-1819 Telephone
(916) 438-1820 Facsimile

Attorneys for Plaintiff, Rodney Anglin
Successor Trustee of the J. & J. Anglin
Family Trust, et. al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO

| | |
|---|---|
| RODNEY D. ANGLIN, Successor Trustee of the J. & J. Anglin Family Trust, RODNEY D. ANGLIN, Individually, RICHARD D. ANGLIN and MICHAEL W. ANGLIN, | NO. 07AS04602 |
| Plaintiffs, | **COMPLAINT** |
| vs. | **1. STRICT PRODUCTS LIABILITY-MANUFACTURING DEFECT**<br>**2. STRICT PRODUCTS LIABILITY-DEFECTIVE DESIGN**<br>**3. STRICT PRODUCTS LIABILITY-FAILURE TO WARN**<br>**4. FRAUD (CONCEALMENT)**<br>**5. FRAUD**<br>**6. UNFAIR COMPETITION**<br>**7. FALSE ADVERTISING**<br>**8. BREACH OF WARRANTY**<br>**9. MEDICAL NEGLIGENCE/WRONGFUL DEATH**<br>**10. FRAUD**<br>**11. MEDICAL NEGLIGENCE/WRONGFUL DEATH**<br>**12. FRAUD** |
| DAVOL, INC., C.R. BARD INC., SUTTER HEALTH, SUTTER HEALTH SACRAMENTO SIERRA REGION, SUTTER MEDICAL CENTER SACRAMENTO, SUTTER GENERAL HOSPITAL, SUTTER MEDICAL GROUP A CALIFORNIA CORPORATION, SUTTER WEST MEDICAL GROUP, MARION LEFF, M.D., JOYCE A. EAKER, M.D., and DOES 1 through 10, inclusive, | |
| Defendants. | |

///

///

## GENERAL ALLEGATIONS

1. Plaintiff RODNEY D. ANGLIN, Successor Trustee of the J. & J. Anglin Family Trust is the duly named successor trustee ("Trustee") of the J. & J. Anglin Family Trust ("the Trust"). As a result, the Trustee has standing to assert all claims held by the Trust pursuant to CCP §369(a).

2. Plaintiff RODNEY D. ANGLIN is a competent adult who resides in the County of Siskiyou, State of California and is a successor in interest to Jean R. Anglin. Plaintiff RODNEY D. ANGLIN has a claim for the wrongful death of Jean R. Anglin ("the Decedent") pursuant to CCP §377.32.

3. Plaintiff RICHARD D. ANGLIN is a competent adult who resides in the County of Sacramento, State of California and is a successor in interest to the Decedent. Plaintiff RICHARD D. ANGLIN has a claim for the wrongful death the Decedent pursuant to CCP §377.32.

4. Plaintiff MICHAEL W. ANGLIN is a competent adult who resides in the County of Sacramento, State of California and is a successor in interest to Jean R. Anglin. Plaintiff MICHAEL W. ANGLIN has a claim for the wrongful death the Decedent pursuant to CCP §377.32.

5. Jean Anglin was an elderly woman who had the below described Patch implanted in her. As a result of the defective condition of the Patch, Ms. Anglin suffered numerous surgeries to deal with the symptoms associated with the defective patch. The surgeries failed and Ms. Anglin passed away on July 13, 2006, never knowing of the defective condition of the Patch. Ms. Anglin is referred hereto as

("the Decedent").

6. Defendant DAVOL INC. ("Davol") is a corporation formed and existing under the laws of the state of Delaware, with its principal place of business in the State of New Jersey.

7. Defendant C. R. BARD INC. ("Bard") is a corporation formed and existing under the laws of the state of New Jersey, where it also maintains its principal place of business. Plaintiffs believe that Davol is a wholly owned subsidiary of co-defendant Bard.

8. Defendants Davol, Bard and DOES 1-20 are collectively referred to as ("the Product Defendants") and are responsible for numerous causes of action brought by these Plaintiffs as a result of their marketing, advertising, promotional activities in placing the below described Patch on the market.

9. Defendant SUTTER HEALTH is a corporation formed and existing under the laws of the state of California, where it maintains its principal place of business.

10. Defendant SUTTER HEALTH SACRAMENTO SIERRA REGION is a corporation formed and existing under the laws of the state of California, where it maintains its principal place of business.

11. Defendant SUTTER MEDICAL CENTER FOUNDATION is a corporation formed and existing under the laws of the state of California, where it maintains its principal place of business.

12. Defendant SUTTER GENERAL HOSPITAL is an unknown business entity doing business, at least in part, in Sacramento California.

13. Defendant SUTTER MEDICAL GROUP A CALIFORNIA CORPORATION, is a corporation formed and existing under the laws of the state of California, where it maintains its principal place of business.

14. Defendant SUTTER WEST MEDICAL GROUP is an unknown business entity doing business, at least in part, in Sacramento California.

15. Defendants SUTTER HEALTH, SUTTER HEALTH SACRAMENTO SIERRA REGION, SUTTER MEDICAL CENTER FOUNDATION, SUTTER GENERAL HOSPITAL, SUTTER MEDICAL GROUP A CALIFORNIA CORPORATION, SUTTER WEST MEDICAL GROUP and DOES 21-40 ("the Hospital Defendants") have regularly conducted business in the State of California. The Hospital Defendants regularly engage in the business practice of owning health care facilities, which includes defendant Sutter General Hospital.

16. Defendant MARION LEFF, M.D., is a physician who performs medical services, at least in part, in Sacramento County.

17. Defendant JOYCE A. EAKER, M.D., is a physician who performs medical services, at least in part, in Sacramento County.

18. Defendants Leff, Eaker and DOES 41-60 are collectively referred to as ("the Physician Defendants") who had knowledge of the defective condition of the below described Patch and failed to warn or advise the Decedent of the same.

19. The true names and capacities, whether individual, corporate, associate, or otherwise of the defendants designated herein as DOES 1-100 are presently unknown to Plaintiffs, who, therefore, sue said defendants by such fictitious names. Plaintiffs are informed and believe, and thereupon allege, that each of the defendants designated

herein as "Doe" is legally responsible for the events and happenings hereinafter referred to, and proximately caused or contributed to the injuries and damages as hereinafter described. Plaintiffs will seek leave of court to amend this complaint in order to show the true names and capacities of such parties, when the same has been ascertained.

20. Plaintiffs are informed and believe, and thereupon allege, that at all times herein mentioned, each of the defendants was the agent, partner, joint, venturer, and/or employee of each of the remaining defendants and was acting within the course and scope of said agency, partnership, joint venture and/or employment. Furthermore, in committing the acts and omissions below, the defendants were all acting with the knowledge, consent, approval and/or ratification of their co-defendants.

21. On or about September 2, 2004, the Decedent, a seventy-one year old female, was scheduled at Sutter General Hospital for a surgery to remove her gallbladder and repair incisional hernias from a prior surgery.

22. Eaker performed the surgery and implanted a Bard Composix Kugel Hernia Patch, which was oval and measured 10.8 inches by 13.7 inches ("the Patch"). The Patch contained the reference number 0010207 and lot number 43JND232. Attached hereto and incorporated herein as Exhibit 1 is a true and correct copy of the Intraoperative Patient Assessment/Care Record, provided by Sutter Medical Center Foundation, which contains the description of the Patch.

23. In or about December, 2005, the Decedent began experiencing

fever, pain and soreness around the surgical site. Later, an abscess and a non-healing fistula developed along the incision site. The Decedent was seen by Leff, who performed several tests and examinations to determine the cause and treatment for the abscess. By May 19, 2006, Leff concluded that the abscess was somehow involved with the Patch, but believed that it was simply an infection at the surgical site.

24. Unknown to the Decedent, on December 22, 2005, the United States Food and Drug Administration ("the FDA") issued a Class I recall of the Patch. A Class I recall means that the recalled product poses a serious danger to patients still using it. The symptoms related to the defective Patch included unexplained or persistent abdominal pain, fever, tenderness at the implant site or other unusual symptoms. Attached hereto and incorporated herein as Exhibit 2, is a true and correct copy of the December 22, 2005 recall notice by the FDA.

25. Apparently, on or about December 27, 2005, the Product Defendants attempted to notify United States customers of the recall by letter. The Decedent never received the letter from the Product Defendants regarding the problems associated with the Patch.

26. On or about March 24, 2006, the Product Defendants issued letters to hospitals and health care professionals alerting them to the recall. No physician ever notified the Decedent of the defective Patch. In fact, the Physician Defendants never advised the Decedent or the Plaintiffs of the defective condition of the Patch.

27. In April 2006, the Patch Class I recall was expanded to the "mid-line" size of the patch and, again in February of 2007 to include the large size patch.

28. By May of 2006, Decedent was suffering from severe pain as a result of the massive infection. The Decedent was referred to Eaker, the surgeon who performed the implant surgery of the Patch. Eaker performed a culture of the drainage from the abscess and fistula and determined that it was a drug resistant strain of staphylococcus aureus, which is also known as the "superbug".

29. At no time did Eaker advise the Decedent of the recall of the Patch but, rather, urged the Decedent to have the Patch removed and have an implant from a cadaver replace the Patch. Given her age, the Decedent did not want to undertake such a serious surgery, as it would require a surgical site commensurate with the size of the Patch.

30. By June 12, 2006, no other treatment would alleviate the infection, including wound debridement and the installation of a wound vacuum device. Additionally, the pain had become intolerable. As a result, the Decedent agreed to have the Patch surgically removed by Eaker. On that date, Eaker removed the Patch from the Decedent, after she was admitted for a "mesh infection".

31. The surgery to remove the Patch lasted four hours. Dr. Eaker found that the Decedent's entire abdomen was covered with a white plaque which was determined to be scar tissue from being against the Gore-tex side of the Patch. Additionally, the Patch had turned under superiorly and became attached to the liver. Apparently the liver was

injured in Eaker's attempts to resect the Patch off of the surface of the liver. For that reason, a portion of the Patch was left attached to the liver.

32. The following day, it was determined that the Decedent was suffering from a perforated bowel, which required further surgical intervention, which lasted another four hours. The abscess continued to grow until it infected other vital organs. Additionally, the Decedent also suffered from a blocked bowel. The Decedent died from the infection related to the defective Patch.

33. Decedent was never aware of the fact that the Patch which was implanted in her was defective. While her family members were with the Decedent after the surgery to remove the Patch, no physicians or surgeons advised them of the fact that the Patch was defective or had been recalled.

34. It was not until December of 2006 did the Plaintiffs learn that the Patch which was implanted in the Decedent had been recalled in the December 2005 FDA recall. No notice had been given to the Decedent regarding the defective nature of the Patch and the Physician Defendants advised the Decedent that she was suffering from an infection because her body was rejecting the Patch.

35. Plaintiffs are informed and believe and thereon allege that at all times material herein, the Product Defendants, and each of them, were and are now engaged in the business of designing, manufacturing, testing, promoting, advertising, selling, distributing, training or instructing the Patch and other hernia patches for medical use.

36. The Patch and related hernia patches manufactured by the

Product Defendants were widely marketed to physicians, hospitals and others in the medical field.

37. The Patch is used to repair incisional hernias caused by thinning or stretching of scar tissue that forms after surgery. The Patches are placed behind the hernia defect through a small incision, which are then held open by a "memory recoil ring" that allows the Patches to be folded for insertion and later spring open and lay flat once it is in place.

38. The purpose of the recall is that the "memory recoil ring" that opens the Patch after it has been inserted into the intra-abdominal space can break. This can lead to bowel perforations and/or chronic fistulae. Additionally, there have numerous reports of severe abdominal pain resulting from pieces of the Kugel patch adhering to patients' bowels or perforated bowels, resulting in the need for bowel dissection surgery to remove the patch and repair the bowels. These are the exact symptoms which the Decedent suffered prior to her death.

39. Through March 10, 2006, the Product Defendants reported a total of 31 "memory recoil ring" breaks, one of which resulted in a death as the patient allegedly developed septic shock, consumptive coagulopathy and acute myocardial infarction after surgery to repair small and large bowel fistulas reportedly caused by perforation by the broken ring. Twenty of the thirty-one breaks had required surgery as the "memory recoil ring" migrated from its original placement.

40. Not long after the FDA expanded the recall of the Patch, the

FDA issued a warning letter to the Product Defendants citing serious regulatory problems with quality assurance systems used in the manufacture of the Patches, as well as its Salute Reusable Fixation devices. The letter, which was dated April 24, 2007, came after the FDA conducted an inspection of the Product Defendants' Cranston, Rhode Island headquarters. The inspection took place from January 23 through March 13, 2007.

41. The FDA issues warning letters when an inspection finds serious problems in the methods, facilities and controls used in the manufacture, storage, packing or installation of a company's products. During its inspection, the FDA found a number of problems at the Product Defendants' headquarters, but the most troubling were problems found with the system the Product Defendants use to track complaints. The letter states that the Product Defendants lacked procedures to handle everything from complaint investigation to the determination of actual recall actions. The FDA said that the lack of these procedures where to blame for the Product Defendants' delays in dealing with the Patch's problems.

42. As a result of the FDA letter, Plaintiffs are informed and believe and thereon allege that had the product Defendants had sufficient procedures in place to handle the complaints and related issues, the Patch would have been recalled earlier. Possibly, this would have resulted in the defective Patch not being implanted in the Decedent. At the very least, physicians, surgeons and hospitals would have been aware of the issues related to the Patch prior to implanting the same in the Decedent.

43. The FDA letter also cited problems with the Product Defendants' manufacture of the Salute Reusable Fixation devices. This device is used for attaching mesh in laparoscopic and open hernia repair and pelvic floor reconstruction. During its inspection, the FDA found no documentation that any testing was performed to ensure that the Salute device met the product Defendants' own specifications. The FDA recalled some of these devices in December, 2006.

44. The FDA letter stated that the problems found during its inspection could be symptomatic of serious underlying problems in the Product Defendants' quality assurance system. The FDA ordered the Product Defendants to investigate and promptly correct the quality procedures. The FDA also warned that the Product Defendants' were in serious violation of the law, and as a result, the FDA could take further regulatory steps against the Product Defendants without notice. These steps could include seizure of product inventories, court injunctions preventing them from selling their products and/or monetary penalties.

45. After the Product Defendants learned that persons who had the Patch or similar Patches manufactured by them suffered severe injuries and/or death they failed to take adequate remedial measures, including informing all of the patients who had these Patches implanted. As a result, the Decedent was not aware that the Patch was defective.

46. Plaintiffs are informed and believe and thereon allege that the Product Defendants knew that the Patch and related patches manufactured, designed and assembled by them were

defective and dangerous; that implanting the Patch in Decedent was more harmful than had the Patch not been implanted; that the Product Defendants knew that the Patch was defective and dangerous, despicable and wilful and in conscious disregard of the safety of the public, placed them on the market without warning potential patients or medical professionals of the defect; and knew when they did do, the Patch would be implanted by medical professionals without inspection for defects; that the Product Defendants, by placing the defective Patch on the market, impliedly represented that the Patch was safe for the purpose of which they were intended; and that the Product Defendants, by placing them on the market and otherwise representing the Patch as able to perform safely, intended that customers, medical professionals and the unknowing public should rely on the Product Defendants' representations. The Decedent, in having the Patch implanted as herein alleged, did rely on the defendants' representations, all to her damage as alleged above. In doing the things aforementioned, the Product Defendants are guilty of malice, oppression and fraud and Plaintiffs are entitled to recover punitive damages.

47. Plaintiffs are informed and believe and thereon allege that the Product Defendants, and at all relevant times that the Patch was manufactured by them was defective as a result of the defendant's failure to give an adequate warning of the particular risk of breaking and causing internal injuries, as well as having the Patch attach itself to bodily organs, rendered the product unsafe for its intended or reasonably

foreseeable use.

48. Plaintiffs are informed and believe and thereon allege that the Product Defendants and each of them, at all relevant times, had specific knowledge of the risk, or could have known of the risk by the application of scientific knowledge available at the time of manufacture, design and/or assembly.

49. Plaintiffs are informed and believe and thereon allege that Product Defendants, and each of them, at all relevant times, knew that the Patch and related patches manufactured, assembled and sold by them were defective in the manner herein alleged, that in all likelihood, the "memory recoil ring" would break which would in turn cause serious injury or death to persons who had said Patch implanted in them, as well as the fact that the Patch may become attached to bodily organs. Yet, notwithstanding this knowledge, the Product Defendants despicably, and in wilful and conscious disregard of the safety of such persons and of the Decedent named herein, without giving any notice of the defect to the purchasers placed and persisted in placing the defective Patch into the stream of commerce, causing them to be implanted in persons, including the Decedent named herein. Plaintiffs are therefore, entitled to exemplary or punitive damages.

50. At all times herein mentioned, the Physician Defendants, where physicians and surgeons licensed to practice medicine and perform surgery under the laws of the State of California and were engaged in the practice of medicine in Sacramento, California.

51. At all times herein mentioned, DOES 61-70, and each of them were the agents and employees of the Physician Defendants and, in doing the things hereinafter alleged, were acting in the scope of their agency and employment and with the permission and consent of the Physician Defendants.

52. In or about 2004, the Decedent employed Leff to diagnose and treat a medical complaint then suffered by the Decedent and specifically to diagnose and treat her incisional hernias and gallbladder related medical problems, among others. Leff eventually referred the Decedent to Eaker to perform surgery related to the incisional hernia and gallbladder issues. The Decedent eventually employed Eaker to perform the above described surgery. Pursuant to the above described employment of Leff ans Eaker, the Physician Defendants performed professional services in the diagnosis, treatment and care of the Decedent. Said diagnosis treatment and care by the Physician Defendants continued until the Decedent's death in July 2006.

53. From and after the time of employment, the Physician Defendants and each of them, so negligently failed to exercise the proper degree of knowledge and skill in examining, diagnosing, treating and caring for the Decedent that Decedent was caused to suffer the injuries and damages hereinafter alleged.

54. As a proximate result of the negligence of the Physician Defendants and each of them, Decedent was required to undergo additional surgeries and subjected to substantial pain and suffering.

55. Plaintiffs are informed and believe and thereon allege that

the either the FDA or the Product Defendants sent communications to all physicians who had implanted the Patch and related defective patches manufactured by those defendants as early as February 2006.

56. Given the Decedent was not aware of the recall, her condition worsened to such an extent that she could not survive the additional surgeries required to remove the Patch and repair her perforated bowel. Had Physician Defendants advised Decedent of the defective nature of the Patch earlier, she may have survived the complications from having the defective Patch implanted.

57. On or about December, 2006, the Plaintiffs discovered that the cause of the Decedent's death was the fact that the Physician Defendants implanted a defective Patch in the Decedent. Prior to December, 2006, Plaintiffs were unaware that the Patch implanted in the Decedent was defective. Plaintiffs made this discovery after requesting the Decedent's medical records from the Hospital Defendants. Prior to her death, the Decedent was under the care of the Physician Defendants and, as a result of the Decedent's justifiable reliance on the Physician Defendants' judgment and care, the Decedent failed to seek other medical advice or treatment to ascertain the true cause of her injuries prior to her death. Such reliance by the Decedent was reasonable and not due to a lack of diligence on the part of the Decedent.

58. As a proximate result of Physician Defendants' negligence, the Decedent sustained injury to her health, strength activity to such an extent that it caused her death.

Additionally, the Physician Defendants caused the Decedent much mental, physical and nervous pain and suffering.

59. As a further proximate result of the Physician Defendants negligence, the Decedent incurred substantial medical bills for the additional surgeries.

60. As a further proximate result of the Physician Defendants negligence, the Plaintiffs have been deprived of the Decedent's society, companionship, attention and support to their damage.

61. As a further proximate result of the Physician Defendants negligence, and the death of the Decedent, the Plaintiffs have incurred funeral and burial expenses.

62. In or about September 2004, the Decedent was admitted into the Hospital Defendants' care for gallbladder surgery wherein the Physician Defendants implanted the defective Patch. The Physician Defendants were the agents and employees of the Hospital Defendants and in doing the things herein mentioned, were acting within the course and scope of their authority as such agents and employees with the consent of the Hospital Defendants.

63. As provided above, the defective Patch was recalled in December 2005 and physicians and hospitals were notified of the defective condition of the Patch. The Hospital Defendant did not inform the Decedent of the defective nature of the Patch following their being advised of the same.

64. The Hospital Defendants' had a duty to inform the Decedent of the defective nature of the Patch and failed to do the same. It was reasonably likely that as a result of not

being informed of the defective nature of the Patch that the Decedent would not have the appropriate remedial action taken to remove the mesh when her symptoms arose.

65. As employees and agents of the Hospital Defendants, the Physician Defendants had a duty to inform the Decedent of the defective nature of the Patch. Neither the Hospital Defendants, nor their employees or agents, nor the Physician Defendants informed the Decedent of the defective nature of the Patch.

66. As a proximate result of the Hospital Defendants and/or the Physician Defendant's negligent omissions, the Decedent was unaware of that the Patch was defective and delayed the more invasive surgery which would have been otherwise required. Had Decedent known of the defective nature of the Patch, she would have immediately had the Patch removed once the symptoms were recognized.

67. As a proximate result of the negligence of the Hospital Defendants and/or the Physician Defendants' omissions, the Decedent was injured as the true reason for her symptoms went undiagnosed. This resulted in the Decedent being subjected to numerous surgeries when her health was already deteriorating due to the massive infection and abscess which had developed as a direct result of the defective Patch.

68. As a further proximate result of the negligence of the Hospital Defendants and/or the Physician Defendants, the Decedent and her Trust incurred substantial medical bills associated with the medical services which were delayed due to the fact that the Hospital Defendants failed to notify the Decedent of the defective Patch.

69. As a further proximate result of the negligence of the Hospital Defendants and/or the Physician Defendants, the Decedent died.

**FIRST CAUSE OF ACTION**

**(Strict Products Liability-Manufacturing Defect-Product Defendants)**

70. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 69 as though fully set forth herein.

71. In or about September 2004, the Decedent required surgery to remove her gallbladder and implant the hernia Patch to reduce the likelihood that she would incur further hernias. Said surgery was performed at the Hospital Defendants' hospital by the Physician Defendants.

72. Plaintiffs are informed and believe and thereon allege that the Product Defendants and each of them, were and are now engaged in the business of designing, manufacturing, testing, promoting, training, instructing, marketing, advertising selling and/or distributing the Patch.

73. The Patch contained a manufacturing defect at the time it left possession of the Product Defendants, and each of them, at the time it was implanted in the Decedent in September 2004. Moreover, it was implanted in a manner which was reasonably foreseeable by the Product Defendants, in an attempt to prevent incisional hernias.

74. As a direct and proximate cause of the manufacturing defect of the Patch, the Patch was a substantial factor and contributing cause to the serious injury and resulting death of the Decedent on July 13, 2006.

75. In doing the things mentioned above, the Product Defendants

and each of them, displayed a conscious disregard for public safety and/or engaged in despicable conduct and are therefore guilty of malice, oppression and fraud and Plaintiffs are therefore entitled to recover punitive damages from the Products Defendants and each of them.

76. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to Plaintiffs and each of them, had she survived.

77. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

78. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, Plaintiffs herein have also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

79. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious

injury and death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

80. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

**SECOND CAUSE OF ACTION**

**(Strict Products Liability-Design Defect-Product Defendants)**

81. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 80 as though fully set forth herein.

82. Plaintiffs are informed and believe and thereon allege that the Product Defendants and each of them, were and are now engaged in the business of designing, manufacturing, testing, promoting, training, instructing, marketing, advertising selling and/or distributing the Patch.

83. The Patch contained a design defect at the time it left possession of the Product Defendants, and each of them, and at the time it was implanted in the Decedent in September 2004. Additionally, it was implanted in a manner which was reasonably foreseeable by the Product Defendants, in an attempt to prevent incisional hernias.

84. As a direct and proximate cause of the design defect of the

Patch, the Patch was a substantial factor and contributing cause to the serious injury and resulting death of the Decedent on July 13, 2006.

85. The defect inherent in the design of the Patch created the likelihood and/or risk of serious injury and/or death when the Patch was implanted in the Decedent in the manner intended and/or reasonably foreseeable by the Product Defendants, and each of them, and the risk described above outweighed any benefits of the Patch's defective design.

86. In doing the things mentioned above, the Product Defendants and each of them, displayed a conscious disregard for public safety and/or engaged in despicable conduct and are therefore guilty of malice, oppression and fraud and Plaintiffs are therefore entitled to recover punitive damages from the Products Defendants and each of them.

87. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to Plaintiffs and each of them, had she survived.

88. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

89. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, Plaintiffs herein have also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

90. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and/or death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

91. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

**THIRD CAUSE OF ACTION**

**(Strict Products Liability- Failure to Warn-Product Defendants)**

92. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 91 as though fully set forth herein.

93. Plaintiffs are informed and believe and thereon allege that the Product Defendants, and each of them, were and are now

engaged in the business of designing, manufacturing, testing, promoting, training, instructing, marketing, advertising selling and/or distributing the Patch.

94. At the time Patch was designed, manufactured, distributed and/or sold, the Product Defendants, and each of them, knew by reason of scientific knowledge and/or information available at the time that the Patch posed a substantial risk of serious injury and/or death.

95. The Product Defendants, and each of them, knew that the Patch would be implanted by medical personnel without inspection and that patients would and could not appreciate the substantial risk of injury and/or death attendant to the implanting of the Patch in the patients.

96. The Product Defendants, and each of them, failed to adequately warn foreseeable medical professionals and potential patients of the Patch, who would not have recognized the risks of serious injury and/or death attendant with the use of the Patch.

97. In or about September 2004, the Patch was implanted in the Decedent in the manner that it was intended and was reasonably foreseeable by Product Defendants that the implanting of the Patch to prevent incisional hernias in patients, that those patients would be seriously injured and/or killed and such acts were the substantial and/or contributing factor causing Decedent's death.

98. Said failure to warn and/or sufficiently instruct the medical personnel by the Product Defendants, and each of them, was a substantial factor and contributing cause to the serious injury and death of the Decedent on July 13, 2006.

99. In doing the things aforementioned, the Products Defendants, and each of them, displayed a conscious disregard for public safety and/or engaged in despicable conduct and are therefore guilty of malice, oppression and fraud. Therefore, Plaintiffs are entitled to recover punitive damages from each of the Products Defendants.

100. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to Plaintiffs and each of them, had she survived.

101. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

102. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, Plaintiffs herein have also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

103. As a further direct and proximate result of the wrongdoing

of the Product Defendants, and each of them, and the serious injury and/or death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

104. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

**FOURTH CAUSE OF ACTION**
**(Fraud (Concealment)-Product Defendants)**

105. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 102 as though fully set forth herein.

106. The Product Defendants, and each of them, while in the possession of unique and pertinent information involving the safety and mechanical reliability of the Patch, presented its Patch as mechanically sound and failed to warn the public of its inherently dangerous design or manufacturing defects.

107. Although the Product Defendants, and each of them knew of the defective condition of the Patch, the Product Defendants suppressed this information and continued their extensive marketing, advertising and sales of the Patch to the general public. The Product Defendants, and each of them knew or

should have known that it was impossible for the Decedent to learn of the defective condition of the Patch prior to it being implanted in her body.

108. The Product Defendants, and each of them, through their own extensive knowledge and expertise regarding the Patch, and through their statements to medical professionals and patients via advertisements, promotional materials and other communications, each of the Product Defendants claimed that the Patch was safe for its intended use and free from manufacturing or design defects.

109. The Product Defendants' misrepresentations and omissions were made intentionally to induce the Decedent to purchase the Patch. Given the Product Defendants, and each of them knew of the defective nature of the Patch, they made such misrepresentations and omissions in order to keep a high profit margin in relation to the Patches.

110. The fact that the Patch was defective is important to the Decedent as she would not have had that device implanted in her body had she known the actual truth. Moreover, because the Product Defendants, and each of them knew of the defective condition of the Patch and continued to market and advertise the patch as safe to the general public establishes the Product Defendants' intent at to deceive the public at large and specifically the Decedent herein.

111. The Decedent did not know of the defective nature of the Patch and would not have agreed to have the Patch implanted had she known the truth.

112. Decedent was clearly harmed by the Product Defendants' fraudulent act of concealing a material fact, as she passed

away from complications due to the defective nature of the Patch.

113. The Product Defendants, and each of their acts in intending to deceive the Decedent was a substantial factor in causing her harm as she would not have had the device implanted had she known the truth.

114. In doing the things aforementioned, the Products Defendants, and each of them, displayed a conscious disregard for public safety and/or engaged in despicable conduct and are therefore guilty of malice, oppression and fraud and Plaintiffs are therefore entitled to recover punitive damages from the Products Defendants, and each of them.

115. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to each of the Plaintiffs had she survived.

116. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

117. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, Plaintiffs herein have also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown.

Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

118. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and/or death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

119. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

**FIFTH CAUSE OF ACTION**
**(Fraud-Product Defendants)**

120. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 119 as though fully set forth herein.

121. The Product Defendants, and each of them, while in the possession of unique and pertinent information involving the safety and mechanical reliability of the Patch, presented its Patch as mechanically sound and failed to warn the public of its inherently dangerous design or manufacturing defects.

122. Although the Product Defendants, and each of them knew of the defective condition of the Patch, the Product Defendants suppressed this information and continued their extensive marketing, advertising and sales of the Patch to the general public. The Product Defendants, and each of them knew or should have known that it was impossible for the Decedent to learn of the defective condition of the Patch prior to it being implanted in her body.

123. The Product Defendants, and each of them, through their own extensive knowledge and expertise regarding the Patch, and through their statements to medical professionals and patients via advertisements, promotional materials and other communications, each of the Product Defendants claimed that the Patch was safe for its intended use and free from manufacturing or design defects.

124. The Product Defendants, and each of them, know that the representation that the Patch was and is inherently false. Moreover, the product Defendants, and each of the, knew of the defective condition of the Patch long before the FDA recalled the Patch in December 2005 and moreover, prior to the Patch being implanted in the Decedent. As a result, the Product Defendants, represented that the Patch was safe, in a reckless and unsafe manner, given the true condition of the Patch when it was implanted in the Decedent.

125. In doing the things aforementioned, the Products Defendants, and each of them, displayed a conscious disregard for public safety and/or engaged in despicable conduct and are therefore guilty of malice, oppression and fraud and Plaintiffs are therefore entitled to recover punitive

damages from the Products Defendants, and each of them.

126. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to Plaintiffs and each of them, had she survived.

127. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

128. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, Plaintiffs herein have also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

129. As a further direct and proximate result of the wrongdoing of the Product Defendants, and each of them, and the serious injury and/or death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of

said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

130. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

131. Given there was no mechanism by which the Decedent could discern the truth of the defective nature of the Patch, her reliance on the Product Defendants advertisements, marketing and promotions was reasonable.

132. As a result of the Product Defendants' fraud, the Decedent was injured as set forth more specifically above. Such injuries resulted in her death and the Product Defendants' misrepresentations are a substantial factor is causing said injuries and death.

**SIXTH CAUSE OF ACTION**
**(Unfair Competition, Cal. Bus. And Prof. Code §17200-Product Defendants)**

133. Plaintiffs reallege and incorporate by reference each and every allegation of Paragraphs 1 through 130, inclusive, herein.

134. The Product Defendants engaged in unfair business practices by fraudulently representing the Patch and related patches manufactured by them in their advertising, solicitation, promotions and training. Specifically, the Product Defendants represented that the Patch was a safe instrument to be implanted and would cause less scarring by allowing

for a smaller incision. At that time, the Product Defendants knew based on scientific evidence and research that the Patch was subject to failure, which could cause severe injuries and even death.

135. The Product Defendants knew that the Patch was defective, but still intensely marketed the same to medical professionals. The defective nature of the Patch could not be ascertained by medical professionals or patients prior to the damage.

136. The practices of the Product Defendants described above was and is likely to deceive the general public and, therefore, constitute an unfair business practice within the meaning of California Business and professions Code Section 17200. In this case it actually deceived the Decedent and many others who have been damaged or killed as a result.

137. As a direct and proximate result of the Product Defendants' conduct, Product Defendants have received ill gotten gains from the defective Patches. It is believed that the Product Defendants have engaged in similar acts against similarly situated persons and, therefore, have received ill gotten gains from members of the general public. Therefore, the Product Defendants have engaged in unfair business practices which have damaged not only the Plaintiff, but also the general public as well.

**SEVENTH CAUSE OF ACTION**
**(False Advertising , Cal. Bus. & Prof. Code §17500-Product Defendants)**

138. Plaintiffs reallege and incorporate by reference each and every allegation of Paragraphs 1 through 136 inclusive, herein.

139. The Product Defendants engaged in unfair business practices and specifically false advertising by fraudulently representing the Patch and related patches manufactured by them in their advertising, marketing, solicitation, promotional activities and training. Specifically, the Product Defendants represented that the Patch was a safe instrument to be implanted and would cause less scarring by allowing for a smaller incision. At that time, the Product Defendants knew, based on scientific evidence and research, that the Patch was subject to failure, which could cause severe injuries and even death.

140. The Product Defendants knew that the Patch was defective, but still intensely marketed the same to medical professionals and the public at large. The defective nature of the Patch could not be ascertained by medical professionals or patients prior to the damage.

141. The practices of the Product Defendants described above was and is likely to deceive the general public and, therefore, constitute an unfair business practice within the meaning of California Business and professions Code Section 17200. In this case it actually deceived the Decedent and many others who have been severely injured or killed as a result of relying on the false statements, or having their medical professionals rely on such false statements

142. The purpose of the false statements by the Product Defendants in their advertising, marketing, solicitation and training was to create a larger market share and higher revenue for their shareholders, all to the detriment of the Decedent and other similarly situated persons, to their

damage.

143. As a direct and proximate result of the Product Defendants' conduct, Product Defendants have received ill gotten gains from make false representations and misleading the public and the medical professionals regarding the defective Patches. As such, the Product Defendants have received ill gotten revenue from the public at large due to their false advertising and misrepresentations. Therefore, the Product Defendants have engaged in false and misleading advertising practices which have severely injured or killed not only the Decedent, but also the general public as well.

**EIGHTH CAUSE OF ACTION**
**(Breach of Warranty-Merchantability-Product Defendants)**

144. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 69 as though fully set forth herein.

145. The Product Defendants were merchants with respect to the Patch which was purchased by the Decedent and there was an implied warranty that such goods were merchantable.

146. The Products Defendants sold the defective Patch which was implanted in the Decedent. The Product Defendants impliedly warranted to the Decedent, her physicians and health care providers that the Patch was of merchantable quality and safe for use for which they were intended.

147. The Product Defendants knew or should have known that the Patch, at the time of the sale, was intended to be used for the purpose of surgically implanting it into a patient's body for hernia repair.

148. The Decedent reasonably relied on the Product Defendants'

judgment, indications and statements that the patch was fit for such use.

149. When the Patches were distributed into the stream of commerce and sold by the product defendants, they were unsafe for their intended use and not of merchantable quality, as warranted by them. Specifically, the Patches had a dangerous propensity to cause serious injuries and death when used as intended and implanted into a patient's body where they could cause serious injury of harm or death to the end user.

150. The Decedent suffered severe injuries and death as a result of the Product Defendants' conduct and actions.

**NINTH CAUSE OF ACTION**
**(Medical Negligence/Wrongful Death-Hospital Defendants)**

151. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 69 as though fully set forth herein.

152. At all times herein mentioned, the Hospital Defendants owned, operated and maintained a hospital known as Sutter General Hospital in the city and county of Sacramento, State of California pursuant to a license duly issued by the California Department of Health.

153. At all times mentioned herein, the Physician Defendants, and each of them, were the agents and employees of the Hospital Defendants and in doing the things herein mentioned, were acting within the course and scope of their authority as such agents and employees with the consent of the Hospital Defendants.

154. In or about September, 2004, the Decedent was admitted to Sutter General Hospital for the purpose of removing her

gallbladder and implanting the Patch to prevent incisional hernias. At that time, the Hospital Defendants, and each of them, undertook to provide the Decedent with such care and attendance as Decedent might require while she was a patient in the hospital.

155. By December 22, 2005, the FDA and the Product Defendants recalled the Patch given it was defective. On December 27, 2005, the Product Defendants notified its customers (medical professionals) of the recall by letter to stop using the product. It is believed that the Hospital Defendants and the Physician Defendants were issued these letters by the Product Defendants.

156. In late 2005, early 2006, the Decedent began experiencing symptoms consistent with symptoms other persons experienced which led to the recall of the Patch. At no time did any defendant in this action contact the Decedent and advise of the fact that the Patch had been recalled.

157. The Hospital Defendants had a duty to inform patients who had received professional medical services related to the implantation of the Patch, after it learned that the Patch had been recalled.

158. The Hospital Defendants breached their duty of care to the Decedent by failing to advise her of the recall notice.

159. As a further direct and proximate result of the wrongdoing of the Hospital Defendants, and each of them, the Decedent suffered extreme pain for a prolonged time given she was misdiagnosed. Specifically, the Physician Defendants initially advised the Decedent that she was suffering from an infection and attempted to treat the same with

prescription medicine. After the medication did not alleviate the symptoms, the Physician Defendants advised that the Decedent's body was rejecting the Patch.

160. Had the Hospital Defendants and/or the Physician Defendants advised the Decedent that the Patch was defective, it is possible that surgery to remove the Patch could have been performed while the Decedent was still strong enough to undergo surgery. Unfortunately, because the Hospital Defendants and Physician Defendants the correct diagnosis was never made.

161. As a further direct and proximate result of the wrongdoing of the Hospital Defendants, and each of them, the Decedent was required to undergo additional treatment, which required multiple surgeries.

162. As a further direct and proximate result of the wrongdoing of the Hospital Defendants, and each of them, the Decedent was unable to recover from said surgeries and dies on July 13, 2006.

163. As a further direct and proximate result of the wrongdoing of the Hospital Defendants, and each of them, the Decedent and her Trust incurred substantial medical bills associated with the misdiagnosis, treatment and care for the injuries she sustained because of the defective Patch.

164. As a further direct and proximate result of the wrongdoing of the Hospital Defendants, and each of them, the Plaintiffs have incurred funeral and burial expenses.

**TENTH CAUSE OF ACTION**
**(Fraud-Hospital Defendants)**

165. Plaintiffs reallege and incorporate by reference all the allegations contained in

Paragraphs 1 through 69 as though fully set forth herein.

166. By December 22, 2005, the FDA and the Product Defendants recalled the Patch given it was defective. On December 27, 2005, the Product Defendants notified its customers (medical professionals) of the recall by letter to stop using the product. It is believed that the Hospital Defendants and the Physician Defendants were issued these letters by the Product Defendants.

167. The Hospital Defendants had a duty to inform patients who had received professional medical services related to the implantation of the Patch, after it learned that the Patch had been recalled.

168. The Hospital Defendants intentionally failed to advise the Decedent of the fact of the recall. Given the relationship between the Hospital Defendants and the Decedent, the Hospital Defendants should have contacted the Decedent to advise her of the recall of the Patch.

169. Moreover, once the Decedent began experiencing the symptoms, which were the cause of the recall of the patch, the Hospital Defendants should have advised the Decedent of the defective Patch.

170. The Decedent relied on the omissions by the Hospital Defendants as she believed that other, less intrusive options were available. Had she known the omitted facts, the Decedent would have had the Patch removed when she first began experiencing the problems associated with the Defective Patch.

171. As a result of her failure to have the proper surgery performed at an earlier date, the infection grew to other

organs and caused her untimely death. The Decedent suffered severe trauma, pain and suffering in relation to the failure of the Hospital Defendants omission of material fact. The omission of fact is and was material as, had she known the truth, she would have taken other action and would have survived.

**ELEVENTH CAUSE OF ACTION**
**(Medical Negligence/Wrongful Death-Physician Defendants)**

172. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 67 as though fully set forth herein.

173. At all times herein mentioned, the Physician Defendants were physicians and surgeons licensed to practice medicine and perform surgery under the laws of California and were engaged in the practice of medicine in the city and county of Sacramento, California.

174. By September 2004, the Decedent was having difficulty with incisional hernias and needed to have her gallbladder removed. She had met with the Physician Defendants to have them diagnose, treat and care for her medical conditions. A surgery was scheduled at the Defendant Hospitals' hospital.

175. In September 2004, the Physician Defendants performed a surgery to remove the Decedent's gallbladder and implant a hernia mesh Patch. Unknown to the Decedent, the Patch was defective and recalled in December, 2005.

176. By late 2005, early 2006, the Decedent began suffering from pain associated with infections. The Decedent was seen by Defendant Leff who determined that she was suffering from infections. After not being able to control the infection

through the use of prescription medication, Leff referred the Decedent back to Defendant Eaker. Dr. Eaker determined that the Decedent was suffering from a drug resistant staph infection and that her body was rejecting the Patch.

177. The Physician Defendants knew that the Product Defendants had recalled the Patch from the market. The Physicians failed to advise the Decedent that the Patch was defective and was the probable source of her infection. Given the Physician Defendants' professional relationship with the Decedent, the physician Defendants, and each of the, was under a duty to warn the decedent of the defective nature of the Patch.

178. By failing to advise the Decedent of the recall of the Patch, the Physician Defendants breached their duty to the Decedent on at least three grounds: first, they had a duty to advise of the recall; second, by failing to advise of the Patch is likely that each of the Physician Defendants failed to properly diagnose the Decedent's injuries; and third, without being informed of the true facts and the relationship of her illness with that of the defective Patch, the Decedent lacked consent to allow the Physician Defendants to perform professional services on her behalf.

179. The Decedent died without ever knowing the true cause of the injuries which led to her demise. For all intensive purposes, the Physician Defendants were responsible for the Decedent's diagnosis, treatment and care following the September 2004 surgery. As a result of the Decedent's justifiable reliance on the Defendant Physicians judgment and care, Decedent failed to seek other medical advice or

treatment to ascertain the true cause of her condition. The failure to discover the negligent cause of the injuries prior to her death was therefore reasonable and not due to any lack of diligence on the part of the Decedent.

180. As a direct and proximate result of the wrongdoing and omission by the Physician Defendants, and each of them, the Decedent died on July 13, 2006.

181. At the time of her death, the Decedent was a Seventy-Three year old woman who did and would have provided society, love and support to Plaintiffs and each of them, had she survived.

182. As a further direct and proximate result of the wrongdoing of the Physician Defendants, and each of them, and the serious injury and death of the Decedent, Plaintiffs herein incurred general damages in the form of the loss of love, companionship, comfort, affection, society and solace and moral support of Decedent in an amount presently unknown. Plaintiffs will seek leave of court to plead and prove the exact amount of said expenses at the time of trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

183. As a further direct and proximate result of the wrongdoing of the Physician Defendants, and each of them, the Decedent has also sustained damages for reasonable funeral, burial and related expenses in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

184. As a further direct and proximate result of the wrongdoing of the Physician Defendants, and each of them, and the serious injury and/or death of the Decedent, Plaintiffs herein have also sustained incidental and/or consequential damages in an amount presently unknown. Plaintiffs will seek leave of court to amend this complaint to set forth the amount of said damages, according to proof at trial, together with interest and/or prejudgment interest thereon at the legal lawful rate.

185. Plaintiffs will further seek prejudgment interest on all items of damages including economic and non-economic damages. These will include, but are not limited to, any and all incidental expenses and compensatory damages, as permitted by law. See California Code of Civil Procedure §685.010(a) and California Civil Code §3291.

**TWELFTH CAUSE OF ACTION**
**(Fraud-Physician Defendants)**

186. Plaintiffs reallege and incorporate by reference all the allegations contained in Paragraphs 1 through 69 as though fully set forth herein.

187. By December 22, 2005, the FDA and the Product Defendants recalled the Patch given it was defective. On December 27, 2005, the Product Defendants notified its customers (medical professionals) of the recall by letter to stop using the product. It is believed that the Hospital Defendants and the Physician Defendants were issued these letters by the Product Defendants.

188. The Physician Defendants had a duty to inform patients who had received professional medical services related to the implantation of the Patch, after they learned that the Patch

had been recalled.

189. The Physician Defendants intentionally failed to advise the Decedent of the fact of the recall. Given the relationship between the Physician Defendants and the Decedent, the Physician Defendants should have contacted the Decedent to advise her of the recall of the Patch.

190. Moreover, once the Decedent began experiencing the symptoms, which were the cause of the recall of the patch, the Physician Defendants were in the best position to ascertain the symptoms and relate those symptoms with those associated with the defective nature of the Patch. As such, the Physician Defendants should have advised the Decedent of the defective Patch.

191. The Decedent relied on the omissions by the Physician Defendants as she believed that other, less intrusive options were available to deal with her symptoms. Had she known the omitted facts, the Decedent would have had the Patch removed when she first began experiencing the problems associated with the Defective Patch.

192. As a result of her failure to have the proper surgery performed at an earlier date, the infection grew to other organs and caused her untimely death. The Decedent suffered severe trauma, pain and suffering in relation to the failure of the Physician Defendants' omission of material fact. The omission of fact is and was material as, had she known the truth, she would have taken other action and would have survived.

WHEREFORE Plaintiffs pray for Judgment was follows:

1. For general damages in a sum to be proven at trial;
2. For special damages in a sum to be proven at trial;

3. For punitive damages in an amount to be proven at trial;

4. For pre-judgment interest, according to law;

5. For attorneys fees, according to proof at the time of trial;

6. For costs of suit; and

7. For such other relief as the Court may deem just and proper.

Dated: October 09, 2007

**EASON & TAMBORNINI**

By: Matthew Eason
Attorneys for Plaintiffs